Filed 11/17/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ESTHER ORTEGA et al., | B300321 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS172114) |
| v. | |
| KIMBERLEY JOHNSON, as Director, etc., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court for Los Angeles County, Mitchell L. Beckloff, Judge. Reversed.

Western Center on Law & Poverty, Alexander Prieto, Richard A. Rothschild; Legal Aid Foundation of Los Angeles, Tyler Sutherland, Yolanda Arias and Andrew Kazakes for Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Richard T. Waldow, Gregory D. Brown and Gregory M. Cribbs, Deputy Attorneys General, for Defendants and Respondents.

The question presented in this appeal is whether recipients of benefits (formerly known as food stamps) under California's CalFresh program are entitled to have their benefits restored when the benefits are lost due to electronic theft, i.e., when an unauthorized person obtains access to a recipient's account by using the recipient's personal account information. Appellants Esther Ortega, Joe Soza, and Hunger Action Los Angeles contend that the plain language of a long-standing regulation duly adopted by respondent California Department of Social Services requires the replacement of CalFresh benefits that are lost due to electronic theft when that theft is promptly reported. Respondents Department of Social Services and Kimberley Johnson[1] contend that the regulation does not require, and does not provide authority for, the replacement of CalFresh benefits.

We conclude the regulation was lawfully adopted and requires the replacement of CalFresh benefits that are lost due to electronic theft, provided a request for replacement is made within 10 days of the loss. Accordingly, we reverse the judgment and direct the trial court, on remand, to grant appellants' petition for writ of mandate.

---

[1]     Lightbourne retired as director of the Department of Social Services after the petition for writ of mandate was filed in the superior court, and Kimberley Johnson was appointed director of the Department on June 27, 2019, before the notices of appeal were filed. https://www.gov.ca.gov/2019/06/27/governor-newsom-announces-appointments-13/

# BACKGROUND

The facts of this case are undisputed. Appellants Esther Ortega and Joe Soza are recipients of CalFresh benefits, i.e., dollar amounts made available to qualified low-income households to be used solely for the purchase of food. Under the CalFresh program, those benefits are maintained on an electronic system, and recipients access their benefits when purchasing food items by using a plastic card similar to a debit card and a personal identification number (PIN) at a point-of-sale terminal. Ortega and Soza each were victims of electronic theft, in which someone accessed their accounts by keying in their account numbers and PINs at a point-of-sale terminal to make unauthorized transactions that consumed almost all of their monthly allotment of benefits. Both promptly reported the theft to the appropriate authorities and requested that the benefits they had lost due to the theft be replaced, but their requests were denied by the Los Angeles County Department of Public Social Services.

Ortega and Soza each challenged the denials of their requests in administrative hearings in the California Department of Social Services Hearings Division. In both hearings, the administrative law judge (ALJ) upheld the denial of the request for replacement benefits based upon the ALJ's interpretation of relevant statutes and regulations, and the ALJs' decisions were adopted by the director of the Department of Social Services.

Together, Ortega and Soza filed in the superior court a petition for writ of mandate under Code of Civil Procedure sections 1085 and 1094.5

and Welfare and Institutions Code[2] section 10962, naming as respondents California Department of Social Services and its director, Will Lightbourne[3] (collectively, DSS). The petition later was amended to add Hunger Action Los Angeles (a "non-profit organization dedicated to ending hunger and promoting healthy eating through advocacy, direct service, and organizing") as an additional petitioner. The petitioners contended that a DSS regulation—Manual of Policies and Procedures (MPP) section 63-603—requires that Los Angeles County's welfare department replace CalFresh benefits that have been lost when a recipient reports that his or her "access device" (which appellants asserted includes the recipient's account number and PIN) was stolen after the recipient received it, and that replacement of those lost benefits is consistent with federal and California law. DSS contended that MPP 63-603 does not require the replacement of CalFresh benefits in such a circumstance, but instead requires only the replacement of the access device. DSS further argued that there is no California or federal statute authorizing replacement of CalFresh benefits lost through electronic theft, that there is no federal or state funding for such replacement, and that requiring DSS to replace those benefits would violate federal statutes, regulations, or guidance.

The trial court denied the petition, finding that DSS's interpretation of its regulation was reasonable in light of the

---

[2]     Further undesignated statutory references are to the Welfare and Institutions Code.

[3]     See footnote 1, *ante*.

4

Legislature's amendment of a statutory provision that addressed reimbursement of electronic benefits that had been stolen, which provided for reimbursement of *cash* benefits that are stolen through electronic theft. The court entered judgment in favor of DSS, from which all three petitioners timely filed notices of appeal.

## DISCUSSION

A.  *The Food Stamp/CalFresh Program*

To assist in our discussion of the issues raised by the parties, we begin with an overview of the development of the food stamp/CalFresh program and the regulations and statutes at issue.

1.  *SNAP and the CalFresh Program*

The CalFresh program was established by the California Legislature to enable low-income California households to receive benefits under the federal Supplemental Nutrition Assistance Program (7 U.S.C. § 2011 et seq.) (SNAP), formerly known as the food stamp program. (Welf. & Inst. Code, §§ 18900, 18900.2.)  Although the federal government provides the benefits under SNAP, each state electing to participate in the program administers the program in that state. In California, CalFresh is administered by county welfare departments (CWDs) with direct oversight by the State through DSS.

In administering SNAP, participating states must comply with the federal SNAP statutes and regulations.  However, states may implement policies not explicitly authorized in the federal statutes and regulations, as long as those policies do not violate the federal statutes

and regulations. Thus, for example, states may issue additional benefits, not specifically authorized under federal statutes but paid for with state funds, to supplement their residents' federal SNAP benefits. Or, as was done in California, states may impose additional requirements as conditions for receiving SNAP benefits, such as requiring applicants to be fingerprinted or to be subject to pre-certification fraud investigations.

Under SNAP (and CalFresh), eligible households receive monthly benefits to be used for the purchase of food. SNAP is the latest iteration of the food stamp act that was first enacted in 1964 (Pub.L. No. 88-525 (Aug. 31, 1964) 78 Stat. 703). Originally, benefits were issued in the form of coupons (or "stamps") that low-income households could purchase and then redeem for food at authorized retailers. The purchase requirement for food stamps was eliminated and the food stamp program was overhauled by the Food Stamp Act of 1977 (Pub.L. No. 95-113, § 1301 (Sept. 29, 1977) 91 Stat. 913) and subsequent amendments to that act. Although the use of physical coupons (or stamps) continued, in 1990 the act was amended to allow states to use electronic benefit transfer (EBT) systems as an alternative method of providing food stamp benefits to households. (Pub.L. No. 101-624, § 1729 (Nov. 28, 1990) 104 Stat. 3783, 3789.) Then, in 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Pub.L. No. 104-193 (August 22, 1996) 110 Stat. 2105), which encouraged states to use EBT systems, rather than food stamps, to distribute food benefits. (*Id*. at § 825.) The following year, the California Legislature enacted the Electronic Benefits

Transfer Act (§§ 10065 et seq.), which called for the development and implementation of a statewide EBT system to deliver CalFresh benefits and other benefits, such as CalWORKs and general assistance benefits.[4] (§ 10069.)

Under California's EBT system, CalFresh recipients receive a plastic card similar to a debit card, along with a personal identification number (PIN). (California Department of Social Services Manual of Policies and Procedures (MPP), §§ 16-001.1, 16-501.)[5] Each month, CWDs load each recipient's CalFresh benefits (i.e., the dollar amount the household is authorized to receive to purchase food) onto his or her EBT account. (MPP, § 16-001.1.11.) The recipient then uses his or her EBT card—either by swiping the card or keying in the account number—and PIN at a point-of-sale terminal at participating retailers to make food purchases.[6] (MPP, § 16-001.1.13, 7 C.F.R. § 274.8(b)(9).)

_____

[4] CalWORKs is the name of the program (California Work Opportunity and Responsibility to Kids) that encompasses the programs formerly called Aid to Families with Dependent Children Program, Family Group and Unemployment program, and the Greater Avenues for Independence program. (§ 10063.) Benefits provided under CalWORKs, general assistance, and similar programs are cash benefits that are provided monthly to qualified recipients.

[5] DSS publishes the MPP online at https://www.cdss.ca.gov/inforesources/cdss-regulations-home-page. The provisions relating to the EBT system can be found at https://www.cdss.ca.gov/ord/entres/getinfo/pdf/ebtman.pdf

[6] The same EBT card and PIN also are used by a recipient of benefits under CalWORKs, general assistance and other programs to access their cash benefits, which are maintained separately and can be accessed at the same terminals, as well as at ATMs. (MPP, § 16-001.12.) Unlike with

7

2. *Regulations Governing the CalFresh Program*

From the beginning of the food stamp program, the California Legislature has directed DSS (or its predecessor, the State Department of Social Welfare) to "[f]ormulate, adopt, amend or repeal regulations . . . affecting the purposes, responsibilities, and jurisdiction of the department and which are consistent with law and necessary for the administration of public social services." (§ 10553, subd. (e); see also former § 10553, subd. (d), Stats. 1965, ch. 1784, § 5, p. 3980.) When the Legislature added the "food stamp" chapter to the Welfare and Institutions Code in 1973 (Stats. 1973, ch. 1216, § 68)—the chapter that now governs the CalFresh program—that chapter included (and continues to include) a provision directing that "[r]egulations, orders or standards of general application to implement, interpret or make specific the law relating to this chapter shall be adopted, amended or repealed only in accordance with Section 10554."[7] (§ 18904.) In

---

CalFresh benefits, which can be used only to purchase food, a recipient of CalWORKs benefits uses the EBT card and PIN to receive cash.

[7] Section 10554 requires that regulations, orders, or standards of general application be adopted, amended, or repealed only in accordance with the Administrative Procedures Act (Gov. Code, § 11340 et seq.), although it provides that "the regulations need not be printed in the California Code of Regulations or California Administrative Register if they are included in the publications of the department." (§ 10554.)

accordance with those provisions, DSS issued a set of regulations governing the state's food stamp program in the MPP.[8]

After Congress passed the Food Stamp Act of 1977, the California Legislature enacted section 18904.1, which provided, in relevant part: "The director, to the extent permitted by federal law, shall establish procedures for food stamp issuance in all counties which guarantee to low-income households the health-vital nutritional benefits available under this chapter and to achieve the most efficient system for program administration so as to minimize administrative costs."[9]  (Former § 18904.1; Stats. 1978, ch. 705, § 5.)  As part of its continuing response to that directive, in March 1991 (after the Food Stamp Act of 1977 had been amended to authorize the use of EBT systems, but before California had enacted the Electronic Benefits Transfer Act), DSS issued a set of regulations in accordance with the Administrative Procedures Act.  DSS described the newly-issued regulations as "a compilation of amendments filed as a result of the first comprehensive review of the issuance and issuance accountability rules in the Food

---

[8]     The regulations governing the food stamp program discussed in this opinion can be found at
https://www.cdss.ca.gov/ord/entres/getinfo/pdf/fsman09.pdf and
https://www.cdss.ca.gov/ord/entres/getinfo/pdf/fsman02.PDF.

[9]     This provision of section 18904.1 currently states:  "The director, to the extent permitted by federal law, shall establish methods for CalFresh benefit issuance in all counties which guarantee to low-income households the health-vital nutritional benefits available under this chapter and to achieve the most efficient system for program administration so as to minimize administrative costs."  (§ 18904.1, subd. (a).)

Stamp Act of 1977." That set of regulations included several regulations that are relevant to this case.

One of the regulations, MPP section 63-602, addresses the types of "issuance systems" that CDWs may use to issue benefits to eligible households: (1) the authorization document system, in which an authorization document is distributed monthly to households, who then surrender the document to the coupon issuer (MPP, § 63-602.1.111); (2) the mail issuance system, in which coupons are directly delivered to households through the mail (MPP, § 63-602.1.112); and (3) the direct access system, "in which benefits are issued directly to the household without the use of an authorization document, based on the issuance agent's direct access to information in the household's individual record on the master issuance or record-for-issuance file," using "either a manual card or automated access to the master issuance or record-for-issuance file" (MPP, § 63-602.1.113).[10]

Another regulation included in this set issued in 1991 is the regulation relied upon by appellants in this case, MPP section 63-603, which addresses "replacement issuances." That regulation begins with the following paragraph: "CWDs shall provide replacement issuances to

---

[10] In another regulation issued as part of the set in 1991, the master issuance file is defined as "a cumulative file containing individual household records for all food stamp households indicating household status and the amount of benefits each household is authorized to receive." (MPP, § 63-102(m)(3).) The record-for-issuance file is defined as "a file which is created monthly from the master issuance file, which shows the amount of benefits each eligible household is to receive for the issuance month and the amount actually issued to the household." (MPP, § 63-102(r)(4).)

households.  In an automated direct access issuance system which uses an access device,[11] a replacement authorization shall be provided to households which have either lost benefits or have lost access to their benefits.  CWDs shall also replace the access device, if necessary, so that the household can complete further transactions.  See [MPP] Section 63-603.43 for provisions regarding the replacement of access devices."  (MPP, § 63-603.1.)

MPP section 63-603 then addresses "Allowable Replacements," stating that "CWDs shall provide a replacement issuance or authorization, as appropriate, as a result of an agency issuance error or when a household reports any of the following occurrences."  (MPP, § 63-603.11.)  The regulation lists those occurrences for each kind of issuance system.  For direct access systems, the regulation states:  "In an automated direct access issuance system using an access device, the initial access device was:  [¶]  (a)  Not received in the mail; [¶]  (b) Stolen from the mail; or [¶]  (c)  Stolen after receipt."  (MPP, § 63-603.115.)  MPP section 63-603 also addresses "Household Reporting Responsibilities," stating that replacement issuances or authorizations shall be provided only if a household timely reports the loss (MPP, § 63-603.15); it provides that when a direct access system is used, a replacement request shall be considered timely if it is made "within 10

---

11      The regulations define "Access device" as "the device which may be used to access the master issuance or record-for-issuance file in an automated direct access system.  A plastic card with a magnetic strip is a type of access device."  (MPP, § 63-102(a)(1).)

days of the loss when an access device is reported as stolen after receipt" (MPP, § 63-603.154(b)).

None of the regulations discussed above was repealed or amended in any significant way after the Electronic Benefits Act was enacted in 1997.

3.     *The Electronic Benefits Transfer Act and Section 10072*

The purpose of the Electronic Benefits Transfer Act was to develop a statewide system for electronic transfer of benefits to recipients of all types of public social services benefits, such as food stamp benefits and CalWORKs cash benefits. (§ 10065, subd. (a).) As part of the act, the Legislature listed certain design requirements for the EBT system. (§ 10072.)

As originally enacted, section 10072 included, as one of the required design elements of the EBT system that: "A recipient shall not incur any loss of benefits after he or she has reported that his or her electronic benefits transfer card or benefits have been lost or stolen. The system shall provide for the prompt replacement of lost or stolen electronic benefits transfer cards and personal identification number." (Former § 10072, subd. (g); Stats. 1997, ch. 270, § 31.) This provision was amended the following year to replace "or benefits" in the first sentence with "or personal identification number" and to add a sentence stating that benefits withdrawn without using an authorized personal identification number also would be replaced. (Stats. 1998, ch. 902, § 8.5.)

The provision remained unchanged (except for a grammatical correction) until 2012.  At that time, the Legislature enacted Assembly Bill No. 2035 (AB 2035), which amended the provision to "address the problem of electronic theft of public benefits that is at issue in *Carpio v. Lightbourne*," a petition for writ of mandate that had been filed in the Los Angeles Superior Court arising from a CalWORKs recipient's loss of cash benefits that had been stolen through the practice of "skimming," i.e., electronic theft.  (Stats. 2012, ch. 319, § 1.)  AB 2035 amended former subdivision (g) of section 10072 in three ways.  First, the entirety of the previous version of the subdivision became a sub-subdivision (subd. (g)(1)).  (Stats. 2012, ch. 319, § 2.)  Second, it referred to the benefits in that sub-subdivision as "electronic benefits" rather than "benefits," so the first sentence stated:  "A recipient shall not incur any loss of electronic benefits after reporting that his or her electronic benefits transfer card or personal identification number has been lost or stolen."  (Former § 10072, subd. (g)(1); Stats. 2012, ch. 319, § 2.)  Third, it added two additional sub-subdivisions to address the electronic theft of cash benefits.  The new subdivision (g)(2) stated:  "A recipient shall not incur any loss of cash benefits that are taken by an unauthorized withdrawal, removal, or use of benefits that does not occur by the use of a physical EBT card issued to the recipient or authorized third party to directly access the benefits.  Benefits taken as described in this paragraph shall be promptly replaced in accordance with the protocol established by [DSS] pursuant to paragraph (3)."  (Former § 10072, subd. (g)(2); Stats. 2012, ch. 319, § 2.)  Subdivision (g)(3) then directed DSS to establish a protocol for recipients to report electronic theft of

13

cash benefits that ensures prompt replacement of those stolen benefits. (Former § 10072, subd. (g)(3); Stats. 2012, ch. 319, § 2.)

Former subdivision (g) later was redesignated as subdivision (i) (Stats. 2014, ch. 720, § 3), and subsequently was further amended to provide additional circumstances in which cash benefits will be replaced (none of which are relevant to this case). (Stats. 2018, ch. 712, § 1.) However, section 10072 continues to distinguish between the loss of "electronic benefits" (which, under subdivision (i)(1), will be replaced if the loss occurs after the recipient reports that his or her EBT card or PIN has been lost or stolen) and the loss of "cash benefits" (which, under subdivision (i)(2) will be replaced if the loss is the result of electronic theft or other types of fraud).

Two months after AB 2035 was enacted, DSS issued interim instructions for its implementation, and issued final instructions, in the form of an "All County Letter" (ACL No. 13-67), on August 30, 2013.[12] The ALC stated that DSS has established protocols for recipients who believe their EBT cash benefits were stolen by electronic theft, and listed the programs that are subject to AB 2035. It also stated: "The AB 2035 statute does not apply to food benefits issued via the CalFresh and California Food Assistance Program (CFAP). If a recipient believes that their CalFresh or CFAP benefits have been stolen as a result of electronic theft, they are to call the California EBT Customer Service Helpline to report the stolen benefits and file a dispute claim."

---

[12] The ALC stated that DSS would be issuing regulations to implement AB 2035 separately.

14

With this background in mind, we turn to the arguments of the parties.

B.   *Arguments of the Parties*

Appellants argue on appeal that the plain language of MPP section 63-603 requires CWDs to replace CalFresh benefits when a recipient promptly reports that his or her "access device"—which under the definition set forth in MPP section 63-102(a)(1) includes a recipient's account number and PIN—was stolen after receipt. They contend that this understanding of MPP section 63-603 is consistent with the stated purpose of the CalFresh and SNAP programs,[13] and is necessary to satisfy the directive of section 18904.1 that the "methods for CalFresh benefit issuance . . . *guarantee* to low-income households the health-vital nutritional benefits available" under the CalFresh program. (§ 18904.1, subd. (a), italics added.) They also assert that this plain-language interpretation of MPP section 63-603 does not conflict

_____

[13]      See section 18900 ("Finding that hunger, undernutrition, and malnutrition are present and continuing problems faced by low-income California households, and further finding that the federal Supplemental Nutrition Assistance Program . . . offers significant health-vital benefits, the purpose of this chapter is to establish a statewide program to enable recipients of [public and general assistance] and other low-income households to receive benefits under the federal Supplemental Nutrition Assistance Program"); 7 U.S.C. § 2011 ("Congress finds that the limited food purchasing power of low-income households contributes to hunger and malnutrition among members of such households. . . . To alleviate such hunger and malnutrition, a supplemental nutrition assistance program is herein authorized which will permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation").

with federal statutes or regulations, since there are no statutes or regulations prohibiting states from replacing benefits lost through electronic theft, nor does this interpretation conflict with section 10072, subdivision (i), because that provision does not address CalFresh benefits lost through electronic theft.

DSS argues that Appellants' interpretation of MPP section 63-603 is incorrect, and that the regulation requires only the replacement of the access device if it was stolen after receipt. In any event, DSS contends that MPP section 63-603 cannot provide authority for replacement of CalFresh benefits because that authority must come from state or federal statutes or federal regulations; in adopting the regulation, DSS had authority only to "implement, interpret or make specific the law" relating to the CalFresh program (§ 18904), and could adopt such a regulation only "to the extent permitted by federal law" (§ 18904.1). Finally, DSS argues the trial court correctly concluded that its interpretation is consistent with the Legislature's decision, as reflected in section 10072, subdivision (i), to require the replacement only of electronically stolen cash benefits.

### 1.    *Interpretation of MPP 63-603*

The parties' arguments put this case in an unusual posture. In essence, DSS contends that if appellants' interpretation of the plain language of MPP section 63-603 is correct, its regulation is not legal. Therefore, we begin our analysis with the parties' competing interpretations of MPP 63-603.

16

"Generally, an agency's interpretation of its own regulation is entitled to considerable judicial deference.  [Citation.]  Indeed, the agency's construction generally controls unless it is clearly erroneous or inconsistent with the plain language of the regulation.  [Citation.]  But the principle of deference is not without limit; it does not permit the agency to disregard the regulation's plain language.  [Citation.]" (*Motion Picture Studio Teachers & Welfare Workers v. Millan* (1996) 51 Cal.App.4th 1190, 1195 (*Motion Picture*).)  The interpretation of a regulation presents a question of law.  (*Id.* at p. 1196.)

As noted, the relevant provisions of MPP 63-603 state:

- "In an automated direct access issuance system which uses an access device, a replacement authorization shall be provided to households which have either lost benefits or have lost access to their benefits.  CWDs shall also replace the access device, if necessary, so that the household can complete further transactions.  See [MPP] Section 63-603.43 for provisions regarding the replacement of access devices." (MPP, § 63-603.1.)

- "CWDs shall provide a replacement issuance or authorization, as appropriate, . . . when a household reports any of the following occurrences." (MPP, § 63-603.11.)  "In an automated direct access issuance system using an access device, the initial access device was:  [¶]  . . .  [¶]  (c)  Stolen after receipt." (MPP, § 63-603.115.)

17

DSS asserts that "[r]ead in their entirety and in context, MPP sections 63-603.1, 63-603.11 and 63-603.115 require only the replacement of the *access device*, if the access device was stolen after receipt." DSS reaches this conclusion by noting that MPP section 63-603.11 provides for a replacement "issuance or authorization," and asserting that "'authorization' refers to the replacement of the 'authorization document,' and 'issuance' refers to the replacement of 'coupons' and 'access devices' in a direct access issuance system *prior to the use of the EBT system*." (Italics in original; fns. and citations omitted.) DSS explains that at the time the regulation was adopted, "an access device was essentially an electronic authorization document" and was not akin to a debit card such as is used in the current EBT system.

We cannot defer to DSS's interpretation because it is based upon an inaccurate historical view and is inconsistent with the plain language of the statute. First, at the time MPP section 63-603 was adopted in 1991, federal law provided that states "may . . . implement an on-line electronic benefit transfer system in which household benefits . . . are issued from and stored in a central data bank and electronically accessed by household members at the point-of-sale." (7 U.S.C. former § 2016(i)(1)(A); Pub.L. 101-624, § 1729 (Nov. 28, 1990) 104 Stat. 3783.) Federal law also defined "access device" as "any card, plate, code, account number, or other means of access that can be used, alone or in conjunction with another access device, to obtain payments, allotments, benefits, money, goods, or other things of value, or that can be used to initiate a transfer of funds under this Act." (7 U.S.C. former

18

§ 2012(u); Pub.L. 101-624, § 1729 (Nov. 28, 1990) 104 Stat. 3783.) Thus, it is not true that in 1991 an "access device" was simply an electronic authorization document.[14]

Second, and more importantly, the language of MPP section 63-603 does not support DSS's interpretation. The very first paragraph of that regulation states that, in an automated direct access issuance system that uses an access device, CWDs must provide "a replacement authorization . . . to households which have . . . lost benefits . . . [and] shall *also* replace the access device, if necessary." (MPP, § 63-603.1, italics added.) That same paragraph then cites to the provisions (in MPP, § 63-603.43) regarding replacement of access devices. Thus, MPP section 63-603.115's mandate to provide a replacement issuance or authorization if the access device was stolen after receipt cannot be interpreted to mandate the replacement of only the access device.

While DDS's interpretation is clearly erroneous, the question remains whether appellants' interpretation is correct. This determination turns on the answers to two questions. First, is the EBT system an "automated direct access system"? And second, is an account number and PIN an "access device"? We conclude the answer to both questions is "yes."

As noted, a "direct access system" is described in the MPP as a system in which "benefits are issued directly to the household without

---

[14]    We note that DSS's interpretation of access device also conflicts with its own definition of "direct access system," which it describes as a system "in which benefits are issued directly to the household *without the use of an authorization document*." (MPP, § 63-602.113, italics added.)

19

the use of an authorization document, based on the issuance agent's direct access to information in the household's individual record on the master issuance or record-for-issuance file," using "either a manual card or automated access to the master issuance or record-for-issuance file" (MPP, § 63-602.113).  The EBT system (which is used to issue food stamp/CalFresh benefits as well as CalWORKs and other cash benefits) is addressed in a separate division of the MPP.  It describes the system as "an issuance system in which benefits are stored in a central computer database and electronically accessed by cardholders at a POS terminal, ATM, and other electronic fund transfer device utilizing a reusable plastic card."  (MPP, § 16-001.1.)  The MPP explains that "the recipient's benefit information is electronically loaded each month into a central computer account" (MPP, § 16-001.11), and that "[a] magnetic-stripe plastic card is used to access the recipient's account in lieu of issuing food stamp coupons to purchase food items at authorized food retailers" (MPP, § 16-001.12).

This description of the EBT system falls within the description of a direct access system:  in the EBT system, the benefits for all recipients are recorded in a "master issuance file" (i.e., "a cumulative file containing individual records for all food stamp households indicating household status and the amount of benefits each household is authorized to receive" (MPP, § 63-102(m)(3)), and each recipient's monthly benefits are maintained in a "record-for-issuance file" (i.e., "a file which is created monthly from the master issuance file, which shows the amount of benefits each eligible household is to receive for the issuance month and the amount actually issued to the household"

(MPP, § 63-102(r)(4)). The recipient's benefits "are issued directly to the household without the use of an authorization document, . . . [using] a manual card." (MPP, § 63-602.113.) Therefore, we conclude that the EBT system is a direct access system as that term is used in MPP section 63-603.

We also conclude that a recipient's account number/PIN is an "access device" as used that regulation. The MPP defines an "access device" as "the device which may be used to access the master issuance or record-for-issuance file in an automated direct access system. A plastic card with a magnetic strip is a type of access device." (MPP, § 63-102(a)(1).) While this definition does not explicitly state that the account number and PIN constitute an access device, it does not preclude such a determination. And federal law consistently has defined "access device" specifically to include an "account number, or other means of access that can be used, alone or in conjunction with another access device, to obtain" benefits. (See 7 U.S.C. former § 2012(u); Pub.L. 101-624, § 1729 (Nov. 28, 1990) 104 Stat. 3783; see also 7 U.S.C. § 2012(a); 7 C.F.R. § 271.2.)

In short, appellants are correct that the plain language of MPP section 63-603 requires CWDs to replace CalFresh benefits that were lost when a recipient's account number and PIN were stolen after receipt.[15]

---

[15] This requirement applies only if the recipient reports the theft of the account number and PIN and makes a request for replacement of the lost benefits within 10 days of the loss. (MPP, § 63-603.154(b).)

21

### 2. *MPP 63-603 Was Within the Scope of Authority Conferred by Enabling Statutes*

DSS contends that if the language of MPP section 63-603 mandates the replacement of CalFresh benefits lost by electronic theft, the regulation nevertheless does not provide the authority for replacement of those benefits because no state statute or federal statute or regulation requires such replacement. It argues that DSS has authority only to "implement, interpret or make specific the law" relating to the CalFresh program (§ 18904), and that in establishing methods for issuance of CalFresh benefits, DSS may do so only "to the extent permitted by federal law" (§ 18904.1, subd. (a)). And, since no state or federal statute or federal regulation requires DSS to reimburse electronically stolen CalFresh benefits (nor does any state or federal statute ear-mark funding for such reimbursement), DSS contends that to the extent MPP section 63-603 appears to mandate such reimbursement, it exceeds the scope of DSS's rulemaking authority. (Citing, among other cases, *California Emp. Com. v. Kovacevich* (1946) 27 Cal.2d 546, 553 ["An administrative agency may not, under the guise of its rule-making power, exceed the scope of its authority and act contrary to the statute which is the source of its power"].)

Our review of this issue is guided by the California Supreme Court's instruction that ""in reviewing the legality of a regulation adopted pursuant to a delegation of legislative power, the judicial function is limited to determining whether the regulation (1) is 'within the scope of the authority conferred' [citation] and (2) is 'reasonably necessary to effectuate the purpose of the statute' [citation].""" (*Yamaha*

22

*Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11.)
The standard of review of challenges to the legitimacy of quasi-legislative regulations is """respectful nondeference.""" (*Id.* at p. 11, fn. 4.)

DSS is correct that no federal or state statute specifically requires the replacement of CalFresh benefits lost due to electronic theft. But no federal or state statute prohibits the replacement of those lost benefits. And, as appellants observe, the Legislature vested DSS with broad rule-making authority over the state's food stamp program. (§ 10553, subd. (e).) And at the time MPP section 63-603 was adopted, section 18904.1 directed DSS, "to the extent permitted by federal law, [to] establish methods for food stamp issuance in all counties which guarantee to low-income households the health-vital nutritional benefits available under this chapter and to achieve the most efficient system for program administration so as to minimize administrative costs."[16] (Former § 18904.1; Stats. 1979, ch. 1170, § 14, p. 4567.) MPP section 63-603's requirement to replace benefits lost through electronic theft can be understood to be a method for food stamp (or CalFresh) issuance that is reasonably necessary to effectuate the purpose of the CalFresh program, i.e., to "guarantee to low-income households the health-vital nutritional benefits available" under the program (§ 18904.1, subd. (a)). Thus, it comes within the scope of authority conferred to DSS.

---

[16] The current version of section 18904.1, subdivision (a) is identical to the former version, except that it replaces the words "food stamp" with "CalFresh."

23

The fact there is no statute specifically earmarking funding for the reimbursement of electronically stolen CalFresh benefits does not render the regulation beyond the scope of authority conferred, because the Legislature has provided that DSS "may expend, in accordance with law, all moneys made available for its use or for the administration of any statute administered by it." (§ 10601.) We acknowledge that at the time DSS adopted MPP section 63-603, it may not have anticipated the volume of losses CalFresh recipients would suffer as the result of electronic theft, which losses DSS would be required to replace if the federal government does not provide the funds. And it appears that DSS may currently believe that replacement of those losses is not required to guarantee that CalFresh recipients have all the CalFresh benefits available under the program. But DSS cannot refuse to enforce a properly adopted regulation. "If a state agency believes that the regulation it adopted ought to be changed, it may only accomplish that result through the APA procedure, a process that ordinarily requires advance publication and an opportunity for public comment. [Citation.] It may not do so by interpreting the regulation in a manner inconsistent with its plain language." (*Motion Picture, supra*, 51 Cal.App.4th at p. 1195.)

3.    *Section 10072 Does Not Affect Our Analysis*

In finding that DSS is not required to replace CalFresh benefits that are lost through electronic theft, the trial court relied in part on AB 2035, which (as discussed in section A.3., *ante*) added a provision to section 10072 requiring the replacement of "cash benefits" that are

taken through electronic theft, and amended the existing provision requiring replacement of any benefits lost after a recipient reports that his or her EBT card has been lost or stolen to specify that it applies to "electronic benefits" that are lost after a report of a lost or stolen EBT card. (Stats. 2012, ch. 319, § 2.) The court noted that, as originally introduced, AB 2035 provided that a "recipient shall not incur any loss of electronic benefits that are removed from his electronic benefits transfer account through skimming" (Assem. Bill No. 2035 (2011-2012 Reg. Sess.) as introduced Feb. 23, 2012), but the language was amended before the bill was passed to provide that a "recipient shall not incur any loss of cash benefits that are taken by unauthorized withdrawal" (Stats. 2012, ch. 319, § 2). Thus, the trial court concluded that the Legislature "deliberately exclude[d] CalFresh benefits" and found that "under state law [DSS] must replace only cash benefits—not CalFresh benefits—stolen through electronic skimming fraud."

We do not find the legislative history so conclusive. Had the Legislature intended to *preclude* the replacement of CalFresh benefits, it could have done so explicitly. It did not. In fact, in describing the amendment that resulted in the change from "electronic benefits" to "cash benefits," the Senate Rules Committee made no mention of an intention to preclude replacement of CalFresh benefits. Instead it described the amendment as follows: "Senate Floor Amendments of 8/21/12 clarify the definition of the electronic theft of benefits in which the EBT card itself is not used by the perpetrator of the theft, commonly known as 'skimming,' and provide clarification of the Department of Social Services' process to replace lost benefits due to skimming." (Sen.

25

Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2035 (2011-2012 Reg. Sess.) as amended Aug. 21, 2012.)

Moreover, from its introduction through its enactment, the stated purpose of AB 2035 was to "address the problem of electronic theft of public benefits *that is at issue in Carpio v. Lightbourne*." (Assem. Bill No. 2035 (2011-2012 Reg. Sess.), § 1, as introduced Feb. 23, 2012, italics added; see also Stats. 2012, ch. 319, § 1.) The public benefits at issue in *Carpio v. Lightbourne* (Super. Ct. Los Angeles County, 2011, No. BS135127) were CalWORKs cash benefits. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2035 (2011-2012 Reg. Sess.) as amended June 18, 2012.) Therefore, the legislative findings and declarations set forth in AB 2035—from its introduction through its enactment (with one spelling correction)—refer only to CalWORKs benefits: "(a) State law provides relief for CalWORKs parents and recipients, to restore their benefits when stolen. [¶] (b) However, no similar remedy exists when the benefits are delivered in electronic form, via an electronic benefits transfer (EBT) card, and the benefits have been stolen through the practice of skimming. [¶] (c) Countless families that depend on the basic needs grants CalWORKs provides are vulnerable to electronic crimes, and currently have nowhere to turn. [¶] (d) Because of this inequity, a petition for writ of mandate, Carpio v. Lightbourne (Case No. BS135127) was filed in the Los Angeles County Superior Court in December 2011, to address a solution for families that have been victims of skimming. [¶] (e) It is therefore the intent of the Legislature in enacting this act to address

26

the problem of electronic theft of public benefits that is at issue in Carpio v. Lightbourne."  (Stats. 2012, ch. 319, § 1.)

In light of this singular focus on CalWORKs benefits, the amendment that changed "electronic benefits" to "cash benefits" cannot be attributed to a legislative intent to preclude the replacement of CalFresh benefits under MPP section 63-603.

4.      *Conclusion*

We conclude that MPP section 63-603 was lawfully adopted and does not conflict with any state or federal statute, and that its plain language requires CWDs to replace CalFresh benefits lost through electronic theft (provided a replacement request is made within 10 days of the loss).  Therefore, the trial court erred by denying appellants' petition for writ of mandate.

//

//

//

//

//

//

//

//

//

## DISPOSITION

The judgment is reversed.  The trial court is directed on remand to grant the petition for writ of mandate.  Appellants shall recover their costs on appeal.

**CERTIFIED FOR PUBLICATION**


WILLHITE, Acting P. J.

We concur:


COLLINS, J.


CURREY, J.